IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION


**MISTY HENNING,**

         **Plaintiff,**

**vs.**                                              **Case No.  5:14cv87-CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

         **Defendant.**

_____/


## <u>MEMORANDUM OPINION AND ORDER</u>

         This is a Social Security case referred to the undersigned United States

Magistrate Judge upon consent of the parties and reference by District Judge Richard

Smoak.  Doc. 13.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful

consideration of the entire record, the Court reverses the decision of the Acting

Commissioner (Commissioner) and remands this case for further proceedings.

## I.  Procedural History

         On July 19, 2012, Plaintiff, Misty Henning, filed applications for a period of

disability and Disability Insurance Benefits (DIB) and Supplemental Security Income

(SSI), alleging disability beginning on September 1, 2011, based on borderline

personality, bipolar, and post-traumatic stress disorder (PTSD).  R. 11, 181-94, 209.

(Citations to the record shall be by the symbol "R." followed by a page number that

appears in the lower right corner of each page.)  Plaintiff's date last insured, or the date

by which her disability must have commenced to receive DIB, is June 30, 2013.  R. 12, 206.

Plaintiff's applications were denied initially on August 20, 2012, and upon reconsideration on December 21, 2012.  R. 11, 100-111, 117-128.  On January 14, 2013, Plaintiff requested a hearing.  R.11, 129-30.

On May 23, 2013, and prior to the hearing, Plaintiff's counsel requested the Administrative Law Judge (ALJ) to issue a subpoena so that Plaintiff's husband could appear and testify at the hearing.  R. 11, 264.

On June 12, 2013, a hearing was conducted by ALJ Claire R. Strong.  R. 11, 26, 28.  On June 12, 2013, Plaintiff provided the ALJ with a brief.  R. 175-78.  Plaintiff was represented by Aaron Gartlan, an attorney.  R. 11, 26, 28-30, 112-14, 178.  Plaintiff and her husband testified.[1]  R. 30-50, 58.  Exhibit 1A through 7F were admitted without objection.  R. 30.  The ALJ asked Plaintiff if she was assessed at Life Management Center of NW Florida (Life Management) on January 14, 2013, *see* R. 356-59 (Exhibit 7F), and she testified she was and had been there since that time.  R. 50.  The ALJ stated that she did not have any later (updated) records (to the surprise of Plaintiff) and the ALJ stated the records were needed.  R. 50-51.  Plaintiff's counsel was charged with obtaining the records.  R. 51, 58.  The ALJ noted in her decision that the updated records were not provided.  R. 11; *see* R. 25.  Further, the ALJ told Plaintiff's counsel that she needed "an assessment from a treating physician, that's what will override any consultative exams.  Corroborating testimony only helps when the person can't speak well for themselves."  R. 51.  The ALJ requested a medical source statement from Life

---

[1]  After Plaintiff's testimony, her counsel asked the ALJ if Plaintiff's husband could testify in order to elaborate or provide some detail on some of Plaintiff's testimony.  R. 51, 53; *see infra* at 15-16.

Management regarding Plaintiff's current functioning.  R. 51-52.  The ALJ told counsel that he could obtain a mental residual functional assessment (RFC) form and submit it to the Life Management.  R. 52.  After the hearing concluded, no such form was provided to the ALJ by Life Management.  No vocational expert testified, despite the ALJ noting that Dr. John Black, Ed.D., an impartial vocational expert, appeared and testified.  R. 11, 26-58; *see* R. 139-43 (Resume).

On September 12, 2013, the ALJ issued a decision and denied Plaintiff's applications for benefits concluding that Plaintiff was not disabled from September 1, 2011, through the date of the ALJ's decision.  R. 21.  In her decision, the ALJ denied the request for the subpoena "because it was not reasonably necessary for the full presentation of a case."  R. 11 (citations omitted).  The ALJ noted, however, that "the claimant's husband [Mr. Henning] appeared and testified at the hearing, rendering the issue moot."  *Id.*; *see* R. 54-57; *see also infra* at 15-16.

On November 14, 2013, Plaintiff requested review of the decision and submitted additional medical evidence from Cordova Counseling Center from December 17, 2010, to December 14, 2011.  R. 179-80 (Exhibit 20B), 360-404 (Exhibit 8F).  On January 23, 2014, the Appeals Council denied Plaintiff's request for review, having considered Plaintiff's brief and Exhibit 8F stating, in part: "These reports show continued treatment for your established medically determinable impairments.  Since this evidence does not reveal any significant deterioration in your condition or further restriction in your ability to function, the current weight of the evidence does not change the findings set forth in the hearing decision."  R. 1-6.  The ALJ's decision stands as the final decision of the Commissioner.  20 C.F.R. § 404.981.

On March 28, 2014, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision. Doc. 1. Plaintiff and the Commissioner filed memoranda of law, docs. 17 and 18, which have been considered.

## II. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[2]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

---

[2] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see 20 C.F.R. § 404.1509 (duration requirement).[3] Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. See 42 U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986). 42 U.S.C. § 423(d)(1)(A)

> quite clearly requires that it is the impairment only which must last for a continuous period. Normally, of course, when a claimant has an impairment severe enough to prevent him from working, he will be unable to work for as long as the impairment lasts. This is particularly true when the impairment is physical. The statute, however, does not *require* that a claimant be unable to engage in work during the entire 12 month period. *See also* 20 C.F.R. §§ 404.1505(a);

---

[3] The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

404.1509; 404.1510.  The ability of a claimant to engage in work for limited periods of time certainly calls into question the severity of the impairment, but it does not necessarily determine whether the impairment, however, severe, has lasted for at least 12 months.

While a claimant need only show that an alleged impairment has lasted or can be expected to last for the 12 month period to meet the duration requirement, a claimant alleging a mental impairment may face a difficulty not presented in cases involving physical impairment.  As one court has stated,

> While the mere existence of symptom-free periods may negate a finding of disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of the claim.  Unlike a physical impairment, it is extremely difficult to predict the course of mental illness.  Symptom-free intervals, though sometimes indicative of a remission in the mental disorder, are generally of uncertain duration and marked by an impending possibility of relapse. Realistically, a person with a mental impairment may be unable to engage in competitive employment, as his ability to work may be sporadically interrupted by unforeseeable mental setbacks.

*Lebus v. Harris*, 526 F.Supp. 56, 61 (N.D. Cal. 1981).

Because of such considerations, the courts which have considered the question have concluded that a claimant whose claim is based on a mental condition does not have to show a 12 month period of impairment unmarred by any symptom-free interval. . . .  We agree with the assessment of these courts.  A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an impairment last "for a continuous period of 12 months.". . . . Of course, as required by the regulations, the claimant must present medical evidence which indicates that his mental condition is a long-term problem and not just a temporary setback.

Singletary v. Bowen, 798 F.2d 818, 821-22 (5th Cir. 1986) (citations omitted).  *See*

Lane v. Astrue, No. 1:09-cv-00159-MP-AK, 2010 U.S. Dist. LEXIS 75846, at *28-30

(N.D. Fla. July 28, 2010) (citing Singletary) ("While the Eleventh Circuit Court of Appeals

has not decided this precise issue, other courts that have considered the durational

requirement for a mental impairment and have determined that a plaintiff need not show

12 months of impairment without any periods of remission."  *Id.* at *29 (citations

omitted); *see also* Peterson v. Comm'r of Soc. Sec., Case No. 6:10-cv-1817-ORL-31KRS, 2012 U.S. Dist. LEXIS 20577, at *27-28 (M.D. Fla. Jan. 31, 2012), *adopted*, 2012 U.S. Dist. LEXIS 20726 (M.D. Fla. Feb. 17, 2012).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v).

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have the RFC to perform work despite limitations and are any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot

perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear.  20 C.F.R. § 404.1527.  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors.  20 C.F.R. § 404.1527(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  "This requires a relationship of both duration and frequency."  Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).  "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper

insight into the medical condition of the claimant than will a person who has examined a

claimant but once, or who has only seen the claimant's medical records.' *Barker v.*

*Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id.*

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication than an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must

be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir.

1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must

specify what weight is given to a treating physician's opinion and any reason for giving it

no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work

if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v.

Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ

may discount the treating physician's opinion if good cause exists to do so. Hillsman v.

Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the

opinion is "not bolstered by the evidence," the evidence "supports a contrary finding,"

the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." Lewis, 125 F.3d a1436, 1440 (11th Cir. 1997); Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988); *see* Moore v. Barnhart, 405 F.3d at 1212 ("credibility determinations are the province of the ALJ").  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* Wilson, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *Id.*  On the other hand, "[a] clearly articulated finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995).

## III.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant meets the insured status requirement of the Social Security Act through June 30, 2013."  R. 13.

2. "The claimant has not engaged in substantial gainful activity since September 1, 2011, the alleged onset date."  *Id.*

3. "The claimant has the following medically determinable impairments: bipolar disorder, post-traumatic disorder, borderline personality disorder, and a history of sexual abuse."  R. 14.

4. "The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a *severe* impairment or combination of impairments." *Id.* (emphasis added).  The ALJ discussed relevant medical and other evidence.  R. 15-18.  The ALJ considered the four broad functional areas (known as the "paragraph B" criteria) set out in section 12.00C of the Listing of Impairments in 20 C.F.R, Part 404, Subpart P, Appendix 1 and determined that Plaintiff had *mild* restriction in activities of daily living; *mild* difficulties in social functioning; *mild* difficulties in concentration, persistence or pace; and *no* episodes of decompensation which have been of extended duration. R. 18-21.  The ALJ stopped her analysis at step 2.

5. "The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2011, through the date of [the ALJ's] decision."  R. 21.

## IV.  Evidence

### A.  Plaintiff's Hearing Testimony

**P**laintiff was born in 1990 and 22 years of age at the time of the hearing.  R. 30, 265.  She is married, with no children, and lives in a house with her husband.  R. 31. Her mother-in-law lives next door.  R. 44.  She has a driver's license but does not drive often--maybe once a week or every two weeks to the grocery store or gas station. R. 31; *see* R. 49 (she has no car).  She has no hobbies; she colors, plays on the computer, and watches television.  *Id.*  She does not go to church or visit friends or relatives.  R. 31-32, 42.  She does not like to drive at night.  R. 42.  She tries to avoid people and keep to herself.  *Id.*  She goes to the Elks Club to support her husband, but

she is moody and irritable and does not like being there. *Id.* It hurts her to initiate a conversation because she is "not a very social person." *Id.* She has said "some off-colored things" to a lady volunteer worker at the club who told Plaintiff she could not wear certain clothes and was later told by another that she could wear what she wanted, within reason.[4] R. 43.

Plaintiff dresses herself, but has some problem dressing appropriately and is helped by her husband. R. 43. Her husband "helps [her] out all the time" and "his mom helps [her] out when she can." R. 44. She does not feel she can live on her own. *Id.* She tried living in a trailer the first time she moved out but was not successful--she got "kicked out three weeks later because [she could not] pay what" was due. *Id.* She thinks she would "probably fall apart" without her husband. *Id.* She would have no stability and no one to remind her to take her medication or take a shower or other basic activities. *Id.* She reiterated that she does not like being around other people but fears being alone. R. 44-45.

Plaintiff recently had a miscarriage and was in the hospital overnight and taking an antibiotic and Lortab as needed as needed for pain. R. 32. Prior to being pregnant, she was taking Trazodone (as a mental health medication) and would restart after the miscarriage. R. 33.

On a typical day, Plaintiff sleeps until noon to 1 p.m. depending on how she feels, arises, watches television, and may eat. *Id.* She would watch more television (*e.g.*

---

[4] The ALJ may consider a claimant's daily activities when evaluating the claimant's subjective complaints of disabling pain and other symptoms. <u>Macia v. Bowen</u>, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i). *But see* <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability). The ALJ considered Plaintiff's daily activities. R. 18-19.

Judge Judy, Vampire Diaries, MTV, Wifeswap, and switching channels, R. 41), eat dinner, and that would complete her day. *Id.* She cooks from time to time and for the most part does the grocery shopping. *Id.* She does not do dishes or laundry; her husband does the laundry. R. 33-34, 43. She vacuums floors, does not dust, cleans the bathroom from time to time but does not take out the garbage or do yard work or gardening. R. 34. She does not sleep very well at night; she sleeps mostly during the day, approximately 16 hours in a 24 day. R. 39-40. It is her "way of dealing with [her] life that [she does not] really, particularly, care much for." *Id.* She developed these sleep patterns before she became pregnant. *Id.* She gets some sleep but for the most part gets up and either walks around or uses the bathroom. She "just can't get comfortable enough to fall deep asleep." R. 41.

Plaintiff completed the 12th grade and pursued vocational training in cosmetology but never finished the program for financial and emotional reasons. She never worked in the field. (She stated she was "on too many different types of drugs to control [her] disorder and [she] couldn't function right to finish." She experienced similar issues when she worked for Whataburger when she would cry a lot and go home.) R. 34, 45-46. She did not serve in the military because her step-mother told them she was bipolar and, as a result, the military told her Plaintiff would not be allowed to join the military. R. 35.

At the time of the hearing, she had health insurance coverage under her husband's insurance that started in October or November of 2012, but clarified there was a period when she did not have health insurance prior to this time.[5] She does not

---

[5] A September 15, 2011, patient note stated that Plaintiff had recently lost insurance coverage. R. 363; *see infra* at n. 9.

receive food stamps.  Plaintiff did not testify that she was unable to receive medical treatment because she did not have health insurance.  R. 35-36.

Plaintiff stated that she never had a full-time job, only part-time jobs.  R. 35.  She stated she was unable to work because she did "not handle stress well, and [she does] not like being around a bunch of people."  *Id.*  Her last part-time job was with Whataburger in 2010 and 2011 and she worked four times a week and maybe a five-hour shift as a cashier, dropping fries into the fryer and working at the window passing out drinks.  R. 37.  (Her job at Whataburger was her only job.  R. 50, 197-204.  Plaintiff has reported wages of $2,769.32 and $4,497.39 in 2010 and 2011, respectively, while working at Whataburger.  R. 197-202, 204.)  The job did not work well for her.  She used profanity toward the customers and was written-up "quite a bit" and, as a result, worked in the back area.  R. 37-38.  She argued a lot with employees and especially with her boss because she did not agree with her treatment at the workplace.  R. 38.  She decided to quit because she "was too overly stressed" and her boss told her that "she was trying to find a way to fire [her] or to get [her] to quit legally because" they "can't fire people who have disabilities."  R. 38-39.  Plaintiff stated that she "[p]robably" could not handle that job today.  She does not like being around people and dealing with stress as she does not deal with stress very well.  R. 39.

Plaintiff testified that her most recent receipt of counseling or treatment/therapy began in in January 2013.  R. 35, 50.  She really did not feel she needed therapy or counseling before then, but "thought it would be a good idea to help [her], but personally [she did not] [   ] therapy really helps [her] at all anyway, so --."  R. 36.

Plaintiff stated her relationship with her father and step-mother is non-existent now.  She made an "off-colored" statement on Facebook which they did not like and they said they filed a police report saying she was "crazy" and did not want anything to do with her even after reporting the miscarriage.  R. 47.

Plaintiff "feel[s] angry all the time and it's usually not for any particular reason other than [her] life kind of sucks."  *Id.*  She has directed her anger at her husband and once she threw a remote at his head (and hit him a couple of times) "for just something he did that irritated [her.]"  R. 47-48.  She also directed her anger toward animals or whoever gets in her way.  R. 47.  She broke their television set and her husband's X-Box with a hammer because she was mad.  R. 48.  Her husband works full-time and she calls him a lot to be home with her because she is home alone.  R. 48-49.[6]

### B.  Testimony of Plaintiff's Husband

Plaintiff's husband, Mr. Henning, testified.  R. 54-57.  He agreed that Plaintiff has a temper.  R. 54.  He stated that Plaintiff creates a façade in order to hold off her rage.  *Id.*  Once the façade wears off, Plaintiff isolates or pushes people away.  This behavior has caused her to lose family members and friends and affected her when she has tried to work such that she will show her anger toward them.  *Id.*  Plaintiff has lost most of her friends.  R. 55.  She later regrets what she says due to her anger.  *Id.*  Mr. Henning confirmed Plaintiff's inappropriate behavior at the Elks Club.  R. 55-56.  He did not believe Plaintiff could function without his help.  *Id.*  He has taken time from his work to fix problems at home.  R. 56.  He has to remind Plaintiff to take her medications otherwise she will not take them.  *Id.*  He stated that during her episodes of "deep-

---

[6]  Throughout the decision, the ALJ considered Plaintiff's hearing testimony and her other pre-hearing statements.  R. 15-21.

rooted anger," Plaintiff "will forget the actions that she has taken."  R. 57.  His mother

helps out on a regular basis when he is at work.  *Id.*

> Pursuant to Social Security Ruling 06-3p, the ALJ
>
> considered the statements of the claimant's husband regarding the claimant's functional limitations (Exhibit 3E).  To the extent these statements are considered opinions on the claimant's functional limitations, the undersigned gives them little weight because they were made by a lay (non-medical) source, they are not entirely consistent with the medical evidence since the alleged onset date, and due to the possibility that the individual making these statements may have misrepresented the degree of the claimant's limitations in order to increase the likelihood of the claimant obtaining benefits.

R. 18

### C.  Medical and Other Evidence

> At step 2, the ALJ made extensive findings that are set forth below.
>
> Prior to the alleged onset date, Dr. Marianne McCain, Ph.D., a psychologist, had treated the claimant for posttraumatic stress disorder, avoidant personality features, and borderline personality features (Exhibit 1F, page 19).  Dr. McCain had administered IQ testing to the claimant, and the claimant's IQ scores indicated functioning in the Low Average to Average range of intelligence (Exhibit 1F, pages 7, 16).[7]  The claimant was prescribed psychotropic medications for a

---

[7]  Dr. McCain had been Plaintiff's psychologist since November 13, 2001.  R. 282-84.  In this record, Dr. McCain's first psychological evaluation occurred on April 11, 2005.  R. 265-72.  The second psychological evaluation occurred on July 17 and 18, 2007.  R. 273-81.  On September 13, 2007, Dr. McCain stated that her recent evaluation of July 19, 2007, did not indicate that Plaintiff had ADHD, although she had been diagnosed with PTSD, avoidant personality features, and borderline personality features.  It is also noted that Plaintiff was seeing a psychiatrist for medication management of these disorders.  R. 283.  (On July 12, 2007, Dr. McCain referred Plaintiff to Vincence F. Dillon, M.D., to be evaluated for the possibility of medication for Bipolar Disorder and/or Borderline Personality Disorder.  R. 283.)  On June 25, 2008, Dr. McCain advised Dr. Dillon that she saw Plaintiff "fairly regularly" and that she continued "to show difficulty with decision making, poor judgment, inability to understand the antecedent and consequences of behavior, and in general she has been creating chaos in the family.  Her parents have responded by boundering her, but this only serves to infuriate" her.  Dr. McCain asked Dr. Dillon to "evaluate her for medication that would help her mood and assist her in understanding what is going on around her."  R. 285.  On July 14, 2008, Dr. McCain advised Dr. Dillon of her July 10, 2008, evaluation of Plaintiff noting, in part, that Plaintiff did not appear to be better in terms of the way she was thinking, but was more motivated because of the threat of

period of time between 2005 and 2008 (Exhibit 2F, pages 1-2).[8]  Dr. Randi McDonald, Psy.D., also performed a psychological evaluation of the claimant in November 2010, during which Dr. McDonald diagnosed the claimant with bipolar disorder with psychotic features (per report) and borderline personality disorder and assigned her a Global Assessment of Functioning (GAF) score of 52 (Exhibit 3F, pages 6-7) [R. 316-17].[9]  Dr. McDonald also administered IQ testing, and the results indicated that the claimant was functioning in the Low Average range in overall intellectual abilities, but there was no indication of a learning disorder, and Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2) results revealed that the claimant might have been responding in an exaggerated fashion to the symptom list (Exhibit 3F, page 4, 6) [R. 314, 316].  About six months before the alleged onset date, Dr. Vincence Dillon, M.D., began treating the claimant at the request of the Division of Vocational Rehabilitation.  Dr. Dillon diagnosed the claimant with bipolar disorder and sexual abuse of a child (by history) and assigned her a GAF score of 60 (Exhibit 2F, pages 5-6).  Dr. Dillon maintained the claimant on Strattera, which reportedly improved her attention and energy, and the claimant had no mental status abnormalities (Exhibit 2F, pages 15, 17).  After she was started on Wellbutrin in June 2011, she reported that she was less sad and her behavior was stable and uneventful (Exhibit 2F, pages 17-20).  In fact, Dr. Dillon assigned the claimant improved GAF score of 65 around this time (Exhibit 2F, page 19).[10]  These GAF scores are consistent

---

being sent away to her mother's.  Plaintiff was having difficulty in understanding how she could change her behavior of being out of control.  R. 286.

   8  According to Dr. Dillon's notes of March 29, 2011, Prozac was stopped by June 2007 because of mood swings; Plaintiff was not endorsing it but relatives were; by December 2007, Seroquel was initiated for Bipolar Disorder and when Plaintiff was "psychiatrically hospitalized"; by June 2008, Strattera was initiated because of ADHD-like symptoms; by July 2008, Strattera and Seroquel were stopped; and since that time, Plaintiff was followed by Dr. Tran and Seroquel was titrated up to 600 mg a day, but Plaintiff had increased moodiness and irritability.  Plaintiff presented for further testing.  R. 289.  Dr. Dillon saw Plaintiff on March 29-30, 2011, April 7, 2011, May 1 and 3, 2011, and June 6, 2011.  R. 288-305.  The ALJ briefly summarized Dr. Dillon's evaluations below.

   9  Dr. McDonald reported in a January 4, 2011, psychological evaluation that Plaintiff was referred to her by Ms. Elizabeth Leath of the Division of Vocational Rehabilitation for the purpose of conducting a psychological evaluation.  R. 311; see R. 319-20 (Dec. 17, 2010 letter to Ms. Leath reporting, in part, a GAF score of 52).  The evaluation was performed on November 3 and 5, 2010.  Id.  Dr. McDonald noted on September 15, 2011, to Summer Hanson, Division of Vocational Rehabilitation, that Plaintiff had "recently lost insurance coverage and is in need of assistance with paying for psychiatric medications and medication management services."  R. 363.

with the claimant's GAF scores from the Cordova Counseling Center during that time (Exhibit 3F, pages 11, 15-16, 18-19, 30-33) [R. 311-43].  It should also be noted that the claimant was working as a cashier/fry cook at a fast-food restaurant [Whataburger] between August 2010 and September 2011 despite her medically determinable impairments (Exhibit 2E).  The claimant reportedly stopped working on the alleged onset date because she moved out of a bad situation and could not drive the additional thirty miles in addition to her medical conditions (Exhibit 2E).  However, she testified at the hearing that she stopped working because she was stressed, her boss wanted to dismiss her from employment, and she was denied a promotion.  Nevertheless, after the alleged onset date, the claimant continued to submit resumes.  Although she had broken up with her boyfriend, she had started living with a friend in September 2011 (Exhibit 3F, page 14).  She reportedly had a stable living situation in October 2011, and although she became established with a staffing company, she felt she was not ready to go back to work.  She also reported waning interest in cosmetology school but expressed interest in a vocational evaluation to help get her refocused on goals for school/work (Exhibit 3F, page 21).  She maintained a good relationship with her friend with whom she was living, and even

---

[10]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  DSM-IV-TR 34.  A GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  A GAF score of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.  *Id.*  A GAF score of 71 to 80 indicates that if symptoms are present, they are transient and expectable reactions to psycho-social stressors; no more than slight impairment in social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16.

contemplated starting a family with him (Exhibit 3F, pages 13, 22, 27-28). She visited her boyfriend's family in Marianna in November 2011, and she reported that it "went well" (Exhibit 3F, page 22). She eventually got married in 2012 (Exhibit 5F). She stopped looking for work and planning to attend school because she was contemplating having children, which is unrelated to her medical conditions (Exhibit 3F, pages 12-13, 22). She was started on Depakote in November 2011 and was doing well afterwards (Exhibit 3F, pages 20, 22). Although her mood had been "fairly decent," she reportedly discontinued her psychotropic medications in December 2011 (Exhibit 3F, page 12) [R. 322; see R. 323 (Dec. 15, 2011-"meds working well but 'snapped a few days ago' at their dog"; R. 336 (Nov. 29, 2011-"started meds on Friday & seemed to be doing well, mood is stable. Mood is 'decent.'")]. Treatment notes from the Cordova Counseling Center reflect a normal mental status and no suicide/violence risk between September 2011 and January 2012. During that time, she was assigned GAF scores of 65-70 between September and October 2011, 55-70 in November 2011, 65 in December 2011, and 60 in January 2012 (Exhibit 3F, pages 12-14, 21-22, 29).[11]

The record reflects a significant yearlong gap in the claimant's history of treatment between January 2012 and January 2013, despite the claimant's allegations of disability since September 1, 2011. The January 2013 treatment notes from the Life Management Center note that the claimant had been out of care for an extended period. The claimant's complaints at this time included depression, sleep problems, tiredness/fatigue, violence, anger, hearing/seeing things, and social and family problems. She reportedly had no real friends and expressed violence towards her husband at times but had a fair relationship with him. She also reported that she played with animals, watched television, and slept in her free time. The licensed mental health counselor assigned the claimant a GAF score of 50 at this time (Exhibit 7F) [R. 356-59].

At the request of the Social Security Administration, Dr. Cara Wheeler, Psy.D., performed a psychological consultative examination of the claimant in December 2012 [R. 347-50]. The claimant reported a history of abuse, academic difficulty, and poor interpersonal relationships. She reportedly was "court ordered" to begin psychiatric treatment at thirteen years old, and she said that she had been hospitalized twice. She also alleged that she had engaged in animal cruelty. However, she admitted that she was not currently receiving any type of mental health care. Dr. Wheeler diagnosed bipolar I disorder, most recent episode unspecified, severe with psychotic features, and borderline personality disorder (by history). Dr. Wheeler assigned the claimant a GAF score of 48 and indicated that there might be times when she would require hospitalization for stabilization due to severity of her symptoms (Exhibit 5F).[12]

---

[11]  GAF scores from April through August 2011 ranged from 60 to 70. R. 321, 325-29, 340-42. Plaintiff's GAF score in January 2012 was 60. R. 322; see supra at n. 10.

The consultative examination report from December 2012 and the Life Management Center treatment notes from January 2013 reflect that the claimant's impairments significantly limited her ability to perform basic work activities at that time.  However, the claimant's impairments since then have not resulted in limitations that have lasted for twelve consecutive months.  Additionally, given the claimant's progress during previous treatment in 2011, the evidence suggests that the claimant's condition would improve with appropriate treatment.  Therefore, her impairments are not reasonably expected to last for a period of twelve continuous months.  As such, they do not meet the durational requirements for disability (20 CFR 404.1505 and 416.905).

Prior to the hearing, the claimant alleged that her medication side effects included sleepiness, increased rage, increased depression, increased suicidal thoughts, problems with attention and short-term memory, and zombie-like/comatose effects that made it hard to function.  However, she admitted that

---

[12]  Dr. Wheeler noted that as of the time of her evaluation in December 2012, Plaintiff was "not receiving any mental health and stated that she is discouraged about treatment because it has not been effective in the past.  [Plaintiff] continues to struggle with mood instability that includes: angry outburst, irritability, and aggression.  In addition to this she reported poor sleeping patterns, low motivation, and experiences feelings of hopelessness and worthlessness."  R. 349, 350.  Dr. Wheeler noted that Plaintiff "would likely benefit from consistent psychiatric treatment.  This would be for her safety and the safety of others."  R. 350.  Plaintiff was living with her husband at this time.  R. 347.  Dr. Wheeler provided behavioral observations.  R. 349.  She also reported the results of a mental status examination:

[Plaintiff] was oriented to time, place, person, and circumstances.  She spoke logically and coherently adopting normal rate and adequate volume of speech.  Content of her speech was consistent with the reported level of education and average intellectual functioning.  She stated that she thinks that she "hears voices" most of the time, but denies any other type of hallucinations.  She did not exhibit any bizarre thoughts or behaviors.  She did not appear to be responding to unseen stimuli.  In response to question should provide relevant and well elaborated answers.  She had no difficulty recounting life events in estimating their chronology.  She reported some difficulties with concentration.  She was able to spell the word "world" forwards and backwards.  She reports some problems with memory.  She repeated a list of three unrelated objects and she recalled two of the three after a brief delay with a distractive task.  She stated her mood the past two weeks has been "wishy washy."  Her affect was appropriate.  She denied suicidal or homicidal intent or plan, but stated that when she gets angry she thinks of harming others.  She stated she has difficulty getting to sleep at night.  She reports her appetite "depends."  She appeared to be adequately nourished.

*Id.*

she was not taking medications at times (Exhibits 4E; 3F, pages 7, 28).  In fact, the claimant admitted that she discontinued her psychotropic medications in December 2011 [R. 322, 349].  (Exhibits 3F, page 12; 5F).  This detracts from her credibility regarding the nature and severity of her limitations from her mental health disorders.  Furthermore, she had repeatedly denied any medication side effects on other occasions (Exhibit 2F, pages 15, 17, 19; 3F, page 20).

As for the opinion evidence, little weight is afforded to Dr. Wheeler's opinion that the claimant might require hospitalization for stabilization at times because of the severity of her symptoms because there is no evidence of inpatient treatment since the alleged onset date (Exhibit 7F).  Furthermore, her opinion is inconsistent with notations in the treatment notes from the Cordova Counseling Center showing normal mental status and no suicide/violence risk and the yearlong gap in mental health treatment between 2012 and 2013.  In contrast, the state agency psychological consultants concluded that the claimant did not have a severe medically determinable mental impairment (Exhibits 1A; 2A; 5A; 6A).  Significant weight is given to these opinions, considering the consistency with the treatment notes from Cordova Counseling Center in 2011 and the yearlong gap in the claimant's mental health treatment between 2012 and 2013.

Prior to the alleged onset date, Dr. McDonald commented after the examination in November 2010 that the claimant's history indicated longstanding difficulties with mood disturbance that continued to impact her daily functioning and relationships with others.  However, Dr. McDonald also believed that the claimant was capable of continuing her education, was motivated to succeed in life, and possessed the capability for managing her behavior.  In fact, Dr. McDonald noted that the claimant's vocational rehabilitation prognosis appeared good (Exhibit 3F, pages 7-8, 10).  Consistent with this opinion, the claimant began working as a cashier/fry cook at a fast-food restaurant for six hours a day and four days per week in August 2010 (Exhibit 2E).  Additionally, as previously stated, even after the claimant left her fast-food job, she continued to look for work and was established with Landrum Staffing before she stopped looking for work so that she could start a family.  Therefore, great weight is given to Dr. McDonald's opinions solely concerning the claimant's prognosis for vocational rehabilitation. Otherwise, Dr. McDonald's opinions are given little weight considering the normal mental status and no suicide/violence risk notations in the Cordova Counseling Center treatment notes from 2011 and the yearlong gap in mental health treatment between 2012 and 2013.[13]

---

13  Dr. McDonald recorded Plaintiff expressing suicidal thoughts or ideation on May 26, 2011, R. 329; June 17, 2011, R. 325; and August 16, 2011, R. 342.  Her suicide/violence risk was noted "none" on May 26 and June 28, 2011, and "ideation only" on June 17, 2011.  R. 325, 329, 342; see also R. 321-24, 326-28, 331-36, 340-41, 343 ('reporting "none" for suicide/violence risk).  Her GAF scores on May 26 and August 16, 2011, were 65, and 60 on June 17, 2011.  Id.

Opinions expressed by Dr. McCain in 2005 and 2008 are given little weight because of the remoteness of those opinions with the alleged onset date of disability (Exhibit 1F).  Moreover, the opinions from the state agency psychological consultants are more consistent with the medical evidence of record since the alleged onset date, which includes notations in the treatment notes from the Cordova Counseling Center showing normal mental status and no suicide/violence risk in 2011 and the yearlong gap in mental health treatment between 2012 and 2013.

R. 15-18.

As part of her step 2 analysis, the ALJ considered the four broad functional areas, the "paragraph B" criteria in section 12.00C of the Listings of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 18.  The ALJ concluded: "Because the claimant's medically determinable mental impairments' cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1))."  R. 18-21.

## V.  Legal Analysis

**The ALJ's decision to deny Plaintiff's applications for benefits based upon a finding that Plaintiff's mental impairments are not severe at step 2 of the sequential evaluation process is not supported by controlling principles of law.**

Plaintiff argues that the ALJ erred in determining that Plaintiff did not have a severe impairment.  Doc.  17 at 22-25.  To this end, Plaintiff argues that the ALJ gave too much weight to non-examining State agency consultants who rendered opinions at the initial, R. 59-65, 67-73 (Exhibits 1A and 2A), and reconsideration, R. 77-85, 87-95 (Exhibits 5A and 6A) stages of agency review and too little weight to the opinion of examining State agency consultant's opinion (Dr. Wheeler), R. 347-50.  Doc. 17 at 22.

Plaintiff also argues that the ALJ erred when she mistakenly stated that Dr. McDonald "never noted [Plaintiff] as a suicide risk during her yearlong treatment with Dr. McDonald. (R. 17)." Doc. 17 at 22-23. According to Plaintiff, the ALJ compounded her error by giving Dr. McDonald's opinion "little weight considering the normal mental status and no suicide/violence risk notations in the Cordova Counseling Center treatment notes from 2011." R. 17. Doc. 17 at 23.

At step two, it is Plaintiff's burden to produce evidence of and prove that she has severe mental impairments that significantly limit her ability to perform basic mental work-related activities. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). The issue is whether the claimant has shown that he or she has a condition that has more than "a minimal effect on her ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). To be considered "severe," a medical condition must constitute more than a "deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). Further, a diagnosis alone is not a sufficient basis for a finding that an impairment is severe because "the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." Id. at 1547. "[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir.

1986) (citing <u>Brady v. Heckler</u>, 724 F.2d 914, 920 (11th Cir. 1984)); <u>Edwards v. Heckler</u>, 736 F.2d 625, 630 (11th Cir. 1984); and <u>Flynn</u>, 768 F.2d at 1274.

On the other hand, "[s]tep two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild. . . .Claimant need show only that her impairment is not so slight and its effect is not so minimal."  <u>McDaniel v. Bowen</u>, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying <u>Brady</u>).  It was been said that step two of the sequential analysis may do no more than screen out de minimus claims.  <u>Stratton v. Bowen</u>, 827 F.2d 1447, 1453 (11th Cir. 1987).  Nevertheless, an impairment is not severe if it does not significantly limit a claimant's mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).  "Basic work activities" include: physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; *use of judgment; responding appropriately to supervision, co-workers, and usual work situations*; and dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1)-(6) (emphasis added).  (The emphasized items listed above appear most relevant in this case.)  If a claimant has none or mild limitations in activities of daily living, social functioning, and concentration, persistence or pace, and none in the area of episodes of decompensation, the claimant is generally considered to have no severe mental impairment unless the evidence otherwise indicates that there is more than a minimal limitation in the claimant's ability to do basic work.  20 C.F.R. § 404.1520a(d)(1).[14]

---

[14]   The ALJ is not required, however, to identify all of the impairments that should be considered severe.  *See* <u>Heatly v. Comm'r of Soc. Sec.</u>, 382 F. App'x 823, 825 (11th Cir. 2010) (unpublished).

Mental impairments are evaluated based on how the claimant's mental impairment impacts four functional areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). If the degree of limitation in the first three functional areas is rated as "none" or "mild," and "none" in the fourth area, the Commissioner generally concludes the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1). The ALJ must incorporate the results of this analysis into her findings and conclusions. Moore, 405 F.3d at 1213-14. Cuthbert v. Astrue, 303 F. App'x 697, 699 (11th Cir. 2008) (unpublished). The ALJ provided an extensive analysis of the evidence relating to these functional areas. R. 18-21.

At step two, the ALJ determined that Plaintiff had several medically determinable impairments: bipolar disorder, post-traumatic disorder, borderline personality disorder, and a history of sexual abuse." R. 14. After discussing the relevant evidence, the ALJ concluded that Plaintiff did not have any severe impairments. As a result, the ALJ determined Plaintiff was not disabled. R. 21.

Plaintiff's alleged onset of disability is September 1, 2011. R. 11. Plaintiff was born in 1990 and 22 years of age at the time of the hearing. R. 30. Plaintiff had been in therapy with Dr. McCain, a licensed psychologist, since November 13, 2001. R. 265-72, 282.[15]

Dr. McCain performed the first record psychological evaluation on April 11, 2005, and "her diagnoses looked like Borderline Personality Disorder and [PTSD.]" Id.; see supra at n.7. The second evaluation occurred on July 17 and 18, 2007, and

---

[15] Dr. Wheeler noted that at the age of 13, Plaintiff was "court ordered" to begin psychiatric treatment and since that time had been hospitalized twice and has received years of psychiatric care. R. 350.

Dr. McCain, in a March 5, 2008, letter, noted that Plaintiff "carries a diagnosis of [PTSD], avoidant personality features, and borderline personality features" and given her issues, "tends to display poor judgment in which she fails to anticipate the consequences of her actions."  R. 273-81, 284.  In a June 25, 2008, letter to Dr. Dillon, a treating psychiatrist, Mr. McCain again noted that Plaintiff "continues to show difficulty with decision making, poor judgment, inability to understand the antecedents and consequences of behavior, and in general she has been creating chaos in the family." R. 285.  Dr. McCain asked Dr. Dillon to evaluate Plaintiff "for medication that would help her mood and assist her in understanding what is going on around her."  *Id.*; *see* R. 286 (follow-up letter to Dr. Dillon from Dr. McCain).  Plaintiff was almost 18 years of age when Dr. McCain rendered her second evaluation.  The ALJ gave Dr. McCain's opinions in 2005 and 2008 "little weight" because they are remote from the alleged onset of disability.  R. 18.

Dr. McDonald, a licensed psychologist with the Cordova Counseling Center, evaluated Plaintiff in November 2010 and diagnosed Plaintiff with bipolar disorder with psychotic features (per report) and borderline personality disorder.  R. 311-18. (Ms. Elizabeth Leach of the Division of Vocational Rehabilitation referred Plaintiff to Dr. McDonald.  R. 311, 319-20.)  Dr. McDonald administered IQ testing and the results indicated that Plaintiff was functioning in the Low Average range in overall intellectual abilities, but no indication of a learning disorder, R. 314, and, as noted by the ALJ, the MMPI "results revealed that the claimant might have been responding in an exaggerated fashion to the symptom list."  R. 15 (citations omitted); *see* R. 316.

Dr. McDonald summarized her evaluation and noted, in part, that Plaintiff "impressed [her] as a young woman who is motivated to succeed in life.  She expressed an interest in cosmetology and has spent some time in a training program for such.  She would like to continue her education in the near future.  She faces significant challenges with regards to mood and management of related behaviors, but [she believe[d]] she possess the capability for doing so."  R. 318.

Dr. McDonald listed several strengths and weaknesses, including a strength that "vocational rehabilitation prognosis appears good."  *Id.*; *see* R. 320.  Some of Plaintiff's weaknesses included chronic mood disturbance with history of suicide attempts; limited adaptive coping skills for emotional distress; appears to have limited social supports; conflict with family members; and medication side effects.  R. 318.  As noted by the ALJ:

> [c]onsistent with this opinion, the claimant began working as a cashier/fry cook at a fast-food restaurant [Whataburger] for six hours a day and four days per week in August 2010 (Exhibit 2E).  Additionally, as previously stated, even after the claimant left her fast-food job, she continued to look for work so that she could start a family.  Therefore, great weight is given to Dr. McDonald's opinions solely concerning the claimant's prognosis for vocational rehabilitation.  Otherwise, Dr. McDonald's opinions are given little weight considering the normal mental status and *no suicide/violence risk notations* in the Cordova Counseling Center treatment notes from 2011 and the yearlong gap in mental health treatment between 2012 and 2013.

R. 17 (emphasis added).   (Dr. McDonald, from Cordova, treated Plaintiff from approximately April 2011 to January 2012.  R. 321-43.)

Plaintiff states that the ALJ never noted that Plaintiff was a suicide risk during her year-long treatment with Dr. McDonald and that Dr. McDonald recorded Plaintiff expressing suicidal ideations on May 26, 2011, R. 329, June 16, 2011, R. 325, and August 16, 2011.  Doc. 17 at 22-23.  Plaintiff takes the ALJ to task for her statement that

Dr. McDonald had "no suicidal/violence notations in the Cordova Counseling Center treatment notes from 2011" and claims the ALJ made a "blatant mischaracterization of Dr. McDonald's notes."  Doc. 12 at 23.

Dr. McDonald noted Plaintiff expressing suicidal thoughts or ideation on May 26, 2011, R. 329 ("recent suicidal thoughts"); June 17, 2011, R. 325 ("suicidal ideation"); and August 16, 2011, R. 342 ("reported feeling suicidal").  Dr. McDonald reported Plaintiff's suicide/violence risk assessment, however, as "none" on May 26, June 28, and August 16, 2011, and "ideation only" on June 17, 2011, the only treatment date when this box is checked.  R. 325-26, 329, 342; *see also* R. 321-24, 326-28, 331-36, 340-41, 343 ('reporting "none" for suicide/violence risk).  Her GAF scores on May 26 and August 16, 2011, were 65, R. 329, 342, and 60 on June 17, 2011, R. 325.  *See supra* at n. 10.

Plaintiff's last treatment with Dr. McDonald occurred on January 6, 2012.  R. 322. The patient note states that Plaintiff discontinued psychotropic drugs on December 20, 2011, when her IUD was removed.  *Id.*  Plaintiff stated that her "mood has been 'fairly decent.'  Thinks she may be pregnant already."  *Id.*  Plaintiff was applying for food stamps and social security disability and had no plans for school or work.  *Id.*  Plaintiff was "instructed to contact SURC and discuss changes in education/vocational goals ASAP.  [Plaintiff] [a]cknowledges that she is violating her contract with VR for the most part.  *Id.*  Plaintiff's mood and behavior control as well as conflict within the family was noted as "quite poor."  *Id.*  Plaintiff's GAF score was 60.  *Id.*

Plaintiff argues that the ALJ erred when she used Dr. McDonald's notes to justify discounting Dr. Wheeler's opinion that, according to Plaintiff, Plaintiff "was a danger to

herself and others, and might require hospitalization for stabilization. (R. 350)"; *see* doc.

17 at 23.  At the request of the Social Security Administration, Dr. Wheeler, a licensed

psychologist, examined Plaintiff.  R. 347-50.  Dr. Wheeler noted that as of the time of

her evaluation in December 2012, Plaintiff was

> not receiving any mental health and stated that she is discouraged about
> treatment because it has not been effective in the past.  [Plaintiff] continues to
> struggle with mood instability that includes: angry outburst, irritability, and
> aggression.  In addition to this she reported poor sleeping patterns, low
> motivation, and experiences feelings of hopelessness and worthlessness.

R. 349-50.  Dr. Wheeler noted that Plaintiff "would likely benefit from consistent

psychiatric treatment.  This would be for her safety and the safety of others."  R. 350.

Plaintiff was living with her husband at this time.  R. 347.  Dr. Wheeler provided

behavioral observations that were unremarkable.  R. 349.  She also reported the results

of a mental status examination:

> [Plaintiff] was oriented to time, place, person, and circumstances.  She spoke
> logically and coherently adopting normal rate and adequate volume of speech.
> Content of her speech was consistent with the reported level of education and
> average intellectual functioning.  She stated that she thinks that she "hears
> voices" most of the time, but denies any other type of hallucinations.  She did not
> exhibit any bizarre thoughts or behaviors.  She did not appear to be responding
> to unseen stimuli.  In response to question should provide relevant and well
> elaborated answers.  She had no difficulty recounting life events and estimating
> their chronology.  She reported some difficulties with concentration.  She was
> able to spell the word "world" forwards and backwards.  She reports some
> problems with memory.  She repeated a list of three unrelated objects and she
> recalled two of the three after a brief delay with a distractive task.  She stated her
> mood the past two weeks has been "wishy washy."  Her affect was appropriate.
> She denied suicidal or homicidal intent or plan, but stated that when she gets
> angry she thinks of harming others.  She stated she has difficulty getting to sleep
> at night.  She reports her appetite "depends."  She appeared to be adequately
> nourished.

*Id.*  Dr. Wheeler reported her summary/conclusions:

> [Plaintiff] is a 52 [sic]-year-old female who presents with a history of abuse,
> academic difficulty, and poor interpersonal relationships.  At the age of 13 she

was "court ordered" to begin psychiatric treatment.  Since that time she has been
hospitalized twice has received many years of psychiatric care.  In addition she
reports to animal cruelty that led to death.  [Plaintiff] is not currently receiving any
type of mental health care and would likely benefit from consistent psychiatric
treatment.  This would be for her safety and the safety of others.  There may also
be times when she will require hospitalization for stabilization due to the severity
of her symptoms.

R. 350.  The ALJ appropriately summarized Dr. Wheeler's conclusions.  R. 16.  The ALJ

properly afforded "little weight" to Dr. Wheeler's opinion that Plaintiff might require

hospitalization for stabilization "because there is no evidence of inpatient treatment

since the alleged onset date" of September 1, 2011.  R. 17.  The ALJ also concluded

that Dr. Wheeler's opinion on this point was "inconsistent with notations in the treatment

notes from Cordova Counseling Center showing normal mental status and no

suicidal/violence risk in the year-long gap in mental health treatment from 2012 and

2013."  *Id.*

As noted above, Plaintiff's last treatment with Dr. McDonald occurred on January

6, 2012.  R. 322.  Plaintiff's next evaluation occurred on January 14, 2013, when

Plaintiff was evaluated at Life Management.  R. 356-59.  Thus, there is a year-long gap

between evaluations as noted by the ALJ throughout her decision.  R. 16-18.

During the hearing on June 12, 2013, Plaintiff told the ALJ that she had been

seen on January 14, 2013, at Life Management and thereafter.  R. 50.  The ALJ told

Plaintiff's counsel that she needed "the updated records."  R. 51.  The ALJ reported that

as of the decision date, September 12, 2013, no records were provided.  R. 11, 21.

Nevertheless, notations are provided by Life Management regarding Plaintiff's mental

status, including that Plaintiff had no suicidal or homicidal ideation, but that the risk

assessments for each were not completed.  R. 358.  There is also a notation under risk

of injury to self or others as "[p]resent (comment on precautions)," and that Plaintiff denied suicidal ideation "but often hits husband and throws things." R. 359. A notation indicates that Plaintiff is unemployed and that her job functioning is not impaired. *Id.* It is noted that Plaintiff had a long history of mental illness and counseling and wanted to resume services and that Plaintiff was being seen for mood instability and rages. R. 358. Counseling was recommended. R. 359.

It appears Plaintiff lost her health insurance in or around September 2011, *see* R. 363, although she continued to receive mental health treatment until January 16, 2012, R. 322, and regained health insurance under her husband's insurance in or around October or November 2012. R. 35-36. Her next mental health evaluation was on January 14, 2013. R. 356-59. There is no concrete evidence that Plaintiff sought mental health treatment during the gap period and was unable to obtain same because of her lack of insurance.

For the ALJ, the year-long gap in Plaintiff's mental health treatment is significant. During the hearing, Plaintiff testified that her most recent receipt of counseling or treatment/therapy began in January 2013 at Life Management. R. 50. She stated that she did not feel she needed therapy or counseling before then, but "thought it would be a good idea to help [her], but personally [she did not] [ ] therapy really helps [her] at all anyway, so --." R. 36.

Giving the Plaintiff the benefit of the doubt, the ALJ noted that Dr. Wheeler's December 2012 consultative report and the Life Management treatment notes from January 2013,

> reflect that the claimant's impairments significantly limited her ability to perform basic work activities at that time. However, the claimant's impairments since

then have not resulted in limitations that have lasted for twelve consecutive months.  Additionally, given the claimant's progress during previous treatment in 2011, the evidence suggests that the claimant's condition would improve with appropriate treatment.  Therefore, her impairments are not reasonably expected to last for a period of twelve continuous months.  As such, they do not meet the duration requirements for disability (20 CFR 404.1505 and 416.905).

R. 17.  Herein lies the rub.[16]

The record shows that Plaintiff has had a troubled past that is well-chronicled.

*See, e.g.*, R. 311-13.  By age 20, Dr. McDonald, Plaintiff's treating psychologist, noted in late 2010 (report dated January 4, 2011) that Plaintiff was capable of continuing her education, was motivated to succeed in life, possessed the capability for managing her behavior, and had a "good" prognosis for vocational rehabilitation.  R. 17, 317-18.

Dr. Dillon, a treating psychiatrist, began treating Plaintiff on March 29, 2011.  R. 288; *see supra* at n. 8.  On June 6, 2011, Dr. Dillon noted that Plaintiff was stable on Wellbutrin and examination revealed Plaintiff "to have no serious mental status abnormalities."[17]  R. 304.  As of June 27, 2011, Plaintiff's behavior had been stable and uneventful and medication compliance was good. R. 306.  Her GAF score was 65.  *Id.*; *see supra* at n.10.  Plaintiff's insight and judgment were intact.  *Id.*

After the alleged onset date and after she quit her job at Whataburger, Plaintiff continued to submit resumes and apply for jobs, indicating she believed herself capable of working.  R. 16, 324 (Sept. 14, 2011).  By October 11, 2011, Plaintiff got established at Landrum Staffing, but told Dr. McDonald that she was not ready to return to work.

---

[16]  For the first time, Plaintiff argues in her memorandum that "the record actually supports an onset date of much earlier-December 2005."  Doc. 17 at 25.  Plaintiff did not raise this point before the ALJ or the Appeals Council.  *See, e.g.,* R. 175-79.

[17]  Plaintiff referenced that Dr. Dillon recorded Plaintiff's "suicidal ideations."  Doc. 17 at 23.  Dr. Dillon noted: "Suicidal ideations are acknowledged but suicidal intentions or plans are convincingly denied."  *Id.*

R. 321.  On November 29, 2011, Plaintiff advised Dr. McDonald that she was thinking of getting married and having a baby so she was not looking for work.  R. 16, 332.  She was started on Depakote and doing well in December 2011.  R. 16, 330, 332.  By January 16, 2012, Dr. McDonald noted that Plaintiff discontinued all psychotropic drugs (on December 20, 2011) when her IUD was removed.  Her mood had been "fairly decent"' and she thought she might be pregnant.  R. 16, 322.

"[A]s required by the regulations, the claimant must present medical evidence which indicates that [her] mental condition is a long-term problem and not just a temporary setback."  Singletary v. Bowen, 798 F.2d at 822.  Here, Plaintiff's mental condition has been a problem since she was first treated by Dr. McCain in 2001. R. 282-84.  Plaintiff's ups and downs since that time have been documented, except for the almost year-long gap in mental health treatment between January 2012 and January 2013.  R. 16-18.

The ALJ examined all of the relevant medical and other evidence in the record. The ALJ, however, relied heavily on the gap in medical treatment records for a year that occurred not long after the alleged onset date of September 1, 2011.  R. 16-18. (Plaintiff does not contend that any such records exist such that the record was inadequate.)

For reasons unknown, although Plaintiff testified that she was treated after January 2013 at Life Management, R. 50-53, 58, and through no fault of the ALJ, no records of any such treatment or a medical source statement regarding Plaintiff's current mental functioning report from Life Management, see R. 51-52, 58, were presented to the ALJ or the Appeals Council, despite Plaintiff's counsel being afforded

considerable time from the hearing date of June 12, 2013, through the date of the decision, September 12, 2013, to produce any such records.  After the hearing, Plaintiff provided the Appeals Council with some treatment records from Cordova Counseling Center from December 17, 2010, to December 14, 2011, but no other records.  R. 179, 80 (Exhibit 20B), 360-404 (Exhibit 8F).  The Court will not indulge in speculation regarding the absent records.

Emphasizing the threshold nature of the step 2 finding, the McDaniel court observed that the proper standard "allows only claims based upon the most trivial impairments to be rejected."  McDaniel, 800 F.2d at 1031.  Accordingly, "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could not 'possibly' prevent them from working."  Stratton, 827 F.2d at 1452 n.9 (quoting Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985)).  Here, the ALJ determined that several of Plaintiff mental impairments were non-severe and that ended her analysis at step 2.  R. 17; see supra at 32.

Notwithstanding the ALJ's detailed summary of the relevant evidence, including the ALJ's consideration of the "paragraph B" criteria, *see* R. 18-21, having considered the entire record and given the limited burden placed on Plaintiff at this stage (step 2) of the 5 step sequential evaluation process, it cannot be said that Plaintiff's reported mental impairments are not so trivial such that they are not reasonably expected to last for a period of twelve continuous months and have not adversely affected Plaintiff's ability to perform some of the basic work activities such as use of judgment and

responding appropriately to supervision, co-workers, and usual work situations.  See 20 C.F.R. §§ 404.1505, 404.1521 (b)(4)-(5).[18]

The controlling principles of law require the ALJ at step 2 to reject only the most trivial impairments as non-severe.  Further, as the Fifth Circuit observed, "the courts which have considered the question have concluded that a claimant whose claim is based on a mental condition does not have to show a 12 month period of impairment unmarred by any symptom-free interval," Singletary, 798 F.2d at 822.  The Singletary court distinguished between the duration of severe episodes and the duration of the impairment itself.  "A finding that a claimant has a mental impairment which manifests itself from time to time over a long-term period is not inconsistent with the language of the statute, which requires that an *impairment* last 'for a continuous period of 12 months.'"  *Id.* at 822 (emphasis added); *see* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509 (duration requirement).  Plaintiff's mental condition has manifested itself from time to time over a long-term period, despite some gaps in evaluation and treatment, periods when Plaintiff actually worked (albeit part-time), and made some positive strides in coping with her mental impairments, as noted by the ALJ, R. 15-21. Singletary, 798 F.2d at 822.

The Court does not render an opinion on whether Plaintiff is unable to work and disabled.  The Court only concludes that the ALJ erred in stopping her analysis at step 2 given the record evidence and controlling legal principles discussed above.  According, this case is reversed and remanded to an ALJ to perform the remainder of the

---

[18]  This conclusion is bolstered by the ALJ's finding that "[t]he consultative examination report from December 2012 and the Life Management Center treatment notes from January 2013 reflect that the claimant's impairments significantly limited her ability to perform basic work at that time."  R. 17; *see supra* at 32.

sequential evaluation, including the step 3 analysis; consider whether Plaintiff has the RFC to perform work despite limitations; whether any impairments prevent Plaintiff from performing any past relevant work (if any); and whether Plaintiff's impairments prevent her from performing other work at step 5.  The ALJ should consider whether the assistance of a vocational expert would be beneficial in resolving the issues at steps 4 and 5.[19]

## V.  Conclusion

Considering the record as a whole, substantial evidence does not support the findings of the Administrative Law Judge at step 2 and she did not apply controlling principles of law at this stage of the sequential evaluation process.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this order.

**IN CHAMBERS** at Tallahassee, Florida, on January 20, 2015.

 s/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

---

[19]  In light of the decision made herein, it is unnecessary to consider other issues raised by Plaintiff.  Doc. 17 at 24-31.